**IN UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEXINGTON HEALTHCARE CENTER OF BLOOMINGDALE, INC. *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No.: _____ |
| | ) | Hon. |
| vs. | ) ) | |
| MORRISON MANAGEMENT SPECIALISTS, INC. | ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) | |

### COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

Plaintiffs (collectively, "Lexington Health Network'), for their Complaint against Defendant Morrison Management Specialists, Inc. ("Morrison Living"), state as follows:

### NATURE OF THE ACTION

1.      This action seeks to recover millions of dollars in damages and stop a corporate conglomerate – that provides food and cleaning service to a group of senior health care facilities and nursing homes in Illinois – from executing on a pretextual and heavy-handed contract termination strategy during the Coronavirus crisis.

2.      Lexington Health Network has operated healthcare centers and nursing homes in the Chicagoland area since 1984.  Lexington Health Network has always enjoyed a strong reputation among the community, its residents, and their families.

3.      Lexington Health network retained Morrison Living in April 2019 to provide food, cleaning, laundry, and housekeeping services at the Lexington Health Network facilities.

4.      Morrison Living's performance under the Parties' agreement has been an unmitigated failure.

1

5.  Morrison Living's material breaches of the Parties' Agreement include serving rotten and undercooked food, failing to adequately clean the properties, letting trash pile up, failing to supervise employees, and causing the Lexington Health Network properties to be tagged/cited by regulatory authorities over ten times. All of this is well-documented in emails, letters, customer satisfaction surveys, and other forms of communication.

6.  In March, after months of breaches by Morrison Living, Lexington Health Network sent Morrison Living a lawful termination letter under the Parties' agreement, which provides for a 90-day termination period and thus an effective termination date of June 9, 2020.

7.  The termination period is plainly designed to provide the Parties with reasonable time to transition the services, work out final payment terms, and ensure the residents are cared for through the termination's effective date. Lexington Health Network has offered to compensate Morrison Living millions of dollars to perform its contractual obligations through the end of the termination period.

8.  Since receiving the termination notice, Morrison Living has engaged in a pattern of wrongful acts, chief among them being its retaliatory claim that it can terminate the Agreement on just 7 days' notice and during the Coronavirus Crisis. In addition, Morrison Living continues to make incorrect claims about sums allegedly due to Morrison Living, make thinly veiled threats to not perform its contractual obligations through the termination period, and cause discord and stress among employees (who already have a high level of anxiety because of the current crisis).

9.  This lawsuit seeks monetary damages for Morrison Living's substantial breaches of the Agreement. It also seeks a declaration that Morrison Living's pretextual and retaliatory termination is invalid, and immediate injunctive relief prohibiting Morrison Living's ongoing misconduct during the contractual transition period (*i.e.*, no later than June 9, 2020).

## JURISDICTION AND VENUE

10.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the Plaintiffs are Illinois corporations and citizens, and the Defendant is a Georgia corporation principally located in Georgia. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11.     Defendant is subject to personal jurisdiction in this Action because the acts complained of arise out of its contacts with the State of Illinois, and particularly within the Northern District of Illinois.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Defendant is subject to personal jurisdiction in this District.

## PARTIES

13.     Defendant Morrison Management Specialists, Inc. is a Georgia corporation principally located in Georgia.

14.     Plaintiff Lexington Health Care Center of Bloomingdale, Inc. is an Illinois corporation principally located in Illinois.

15.     Plaintiff Lexington Health Care Center of Chicago Ridge, Inc. is an Illinois corporation principally located in Illinois.

16.     Plaintiff Lexington Health Care Center of Elmhurst, Inc. is an Illinois corporation principally located in Illinois.

17.     Plaintiff Lexington Health Care Center of LaGrange, Inc. is an Illinois corporation principally located in Illinois.

18.     Plaintiff Lexington Health Care Center of Lake Zurich, Inc. is an Illinois corporation principally located in Illinois.

19.     Plaintiff Lexington Health Care Center of Lombard, Inc. is an Illinois corporation principally located in Illinois.

20.     Plaintiff Lexington Health Care Center of Orland Park, Inc. is an Illinois corporation principally located in Illinois.

21.     Plaintiff Lexington Health Care Center of Schaumburg, Inc. is an Illinois corporation principally located in Illinois.

22.     Plaintiff Lexington Square of Elmhurst, LLC is an Illinois limited liability company and its members are principally located in Illinois.

23.     Plaintiff Lexington Square of Lombard, LLC is an Illinois limited liability company and its members are principally located in Illinois.

24.     Plaintiff Eastgate Manor of Algonquin, LLC is an Illinois limited liability company and its members are principally located in Illinois.

## FACTUAL BACKGROUND

**I.     Lexington Health Network Retained Morrison to Provide Food, Cleaning, Laundry, and Housekeeping Services.**

25.     Prior to Lexington Health Network's retention of Morrison Living, Lexington Health Network enjoyed a strong community reputation for almost 35 years, supported by careful oversight, adequate staffing and managerial support, standard operating procedures and practices, and strong internal controls.

26.     In or around 2017, Lexington Health Network began searching for a food service, cleaning, laundry, and housekeeping vendor to maintain and further Lexington Health Network's established success.

4

27.     Morrison Living represented itself as among the highest quality and most sophisticated senior living service providers.  Morrison Living positioned itself as having expertise in activities such as operating and managing dining services, cleaning services, laundry services, and housekeeping services.

28.     Morrison also touted the fact that it is a member of Compass Group, a food service provider that made approximately $25 billion in revenue last year.

29.     Morrison Living's website proclaims that, for 100 years, it has "been serving delicious     food     and     providing     superior     hospitality     services."     *See* https://www.morrisonliving.com/about/.

30.     The website portrays the type of food service and clean environments Morrison Living claims it will provide to its clients.  Examples from the Morrison website:







31.     Morrison Living's social media pages portray the same images of food, cleanliness, and happy residents.  Example (source:  Morrison Living's Instagram Page):



32.     Indeed, when Morrison Living was trying to develop a partnership with Lexington Health Network, Morrison Living put out this spread as being representative of the food service:





## II.     Morrison Breached the Agreement

33.     Based on Morrison Living's representations, the Parties executed an Agreement, effective June 1, 2019.  *See* **Ex. 1** (copy of the Agreement).

34.     Pursuant to the Agreement, Morrison's obligations are to, among other things, "operate and manage the dining services department ("Dining Services") and housekeeping and laundry departments ("Housekeeping and Laundry Services")," including, but not limited to, the following: managing personnel, procuring food and supplies, managing personal clothing, and cleaning the Lexington facilities.

35.     Lexington has so far paid millions of dollars to Morrison under the Agreement.

36.     Unfortunately, Morrison Living has violated the most fundamental parts of the Agreement.  This is well-documented.

37.     Indeed, Lexington Health Network has provided specific and repeated oral and written notice to Morrison Living of Morrison Living's extensive violations of the Agreement. Even following specific and repeated notice, Morrison failed to improve.

38.     Morrison Living has so fundamentally breached the Agreement that cure is completely unfeasible.

39.     A non-exhaustive list of incurable material breaches is set out below.

**Failure to Provide Adequate Food Service and Laundry Service**

40.     The food is often served at least 30 minutes late, and on multiple occasions Morrison Living failed to provide a sufficient quantity of food for all of the residents to be able to eat.

41.      Of particular concern, Morrison Living failed to provide diabetics with medically necessary snacks and food items.  Morrison Living's failure to provide appropriate food service has raised serious additional health risks.

42.     Under Morrison Living's direction, the kitchen and dining halls are often left filthy. The food storage is disorganized and the food lacks proper labels, raising significant concerns for the safety of residents with food allergies.

43.     On multiple occasions, Morrison Living has provided residents with either expired food items or raw/undercooked meat and eggs.

44.     Raising additional concerns, Morrison Living employees have failed to take appropriate sanitation measures while preparing food.  For example, Lexington Health Network identified a Morrison Living employee who was not wearing gloves while also eating from the communal food storage bins.  This was during the employee's shift, while the employee was packing food by hand for later consumption by the residents.

45.     Here are examples of the food and food service areas Morrison Living actually provided, which are exceedingly different than the type of food service Morrison Living represented it would provide under the Agreement:

 














46.     Morrison Living also failed to provide adequate laundry services.

47.     On multiple occasions, residents have reported lost or misplaced laundry items and clothing, which were never returned to those residents.

### Failure to Adhere to Cleaning Responsibilities

48.     Some of Morrison Living's most reprehensible conduct involves its failure to keep the properties clean.  Morrison Living clearly violated its cleaning obligations, as well as the cleaning frequency schedule detailed in Exhibit A of the Agreement.

49.     On multiple occasions, the dining halls, stairwells, resident bedrooms, and bathrooms were not cleaned, and Morrison Living failed to complete the relevant cleaning checklists.

50.     Cleaning failures include, but are not limited to, the following: dirty counters in the serving areas, stained and sticky floors, failing to remove trash in residents' bedrooms, and failing to wash the windows and privacy curtains in the residents' bedrooms.

51.     Residents have refused to remain at Lexington's facilities due to Morrison Living's failure to provide Services.

52.     As an example, a new resident was admitted to a Lexington Health Network facility and shown to her bedroom, which Morrison Living had been scheduled to clean, but failed to do. Immediately after seeing the room, and just minutes after being admitted to the Lexington Health Network facility, the resident refused to move in.

53.     Additional cleaning violations are extensive.  For example, due to Morrison Living's failure to clean the dining halls, Lexington employees identified cockroaches.  And since Morrison Living began work, on multiple occasions, the bathrooms have been missing hand soap, toilet paper, paper towels, and other equipment.

54.    In particular, Morrison Living once failed to clean a second floor bathroom in the Schaumburg location for days, causing the area around the bathroom to smell like urine.

55.    Compounding these failures, Morrison Living staff have refused to clean the facilities even after Lexington Health Network personnel have directly requested their support. For example, Lexington Health Network nurses noticed that the cleaning staff on a prior shift had left a dining hall in complete disarray.   The nurses requested that the Morrison Living staff currently on shift clean the dining hall so that the residents would be able to eat the next meal in a presentable and hygienic space.   When the Morrison Living staff refused to clean, the Lexington Health Network nurses (whose jobs are supposed to be focused on resident care) were required to clean the dining rooms.

56.    Here are examples are Morrison Living letting trash pile up:

 






## Failure to Comply with Federal and State Regulations

57.     Morrison Living failed to operate the dining and housekeeping services in compliance with all applicable federal and state regulations, which is required under the Agreement.  This includes, but is not limited to, the following violations: 1) Morrison Living caused Lexington to suffer fines due to improper waste management and Morrison Living's contamination of recycling; 2) Morrison Living was not knowledgeable of the credentials required by the Illinois Department of Public Health for its Director of Dining Services; 3) Morrison Living allowed an employee to work in the facility kitchen with a positive TB test before a follow up test was conducted, potentially putting all residents and staff at significant risk.

58.     In addition, a surveyor from the Illinois Department of Public Health visited Lexington Healthcare of Chicago Ridge on February 18, 2020.  The surveyor was not specifically observing housekeeping practices, but noted that a resident's room was "very crowded and dirty with a strong urine/feces odor."

59.     The next day, February 19, 2020, another surveyor visited Lexington of Orland Park.  The surveyor informally advised Lexington that the facility failed to meet standards for cleanliness and found that the bathrooms and bedrooms had not been cleaned, that the bathrooms lacked cleaning supplies, and that the trash was not properly located.

60.     On March 10, another complaint survey was initiated by the Illinois Department of Public Health at Lexington of Chicago Ridge regarding a housekeeping concern.

61.     Lexington has received a total of eleven citations in eight months from the Illinois Department of Public Health related to dining and housekeeping services.  Three of these deficiencies were cited as a widespread problem with the potential for more than minimal harm to the residents.  The table immediately below identifies the eleven citations:

| Date of Survey | Facility | Type of Survey | Citation | Scope/Severity |
|---|---|---|---|---|
| 6-Jun-19 | LO | Complaint- Dining | F805 | E |
| 6-Jun-19 | LO | Complaint- Dining | F812 | F |
| 17-Jul-19 | LO | Annual | F692 | E |
| 17-Jul-19 | LO | Annual | F800 | D |
| 17-Jul-19 | LO | Annual | F803 | E |
| 9-Aug-19 | OP | Complaint- EVS | F584 | E |
| 9-Aug-19 | OP | Complaint- Dining | F804 | E |
| 13-Aug-19 | CR | Complaint- EVS | N/A | N/A |
| 11-Sep-19 | LG | Complaint- Dining | N/A | N/A |
| 1-Oct-19 | SC | Complaint- Dining/EVS | N/A | N/A |
| 21-Nov-19 | CR | Complaint-EVS | N/A | N/A |
| 11-Dec-19 | SC | Annual | F803 | E |
| 11-Dec-19 | SC | Annual | F812 | F |
| 11-Dec-19 | CR | Complaint-EVS | N/A | N/A |
| 19-Dec-19 | CR | Complaint- Dining | F805 | D |
| 7-Jan-20 | LO | Complaint- Dining | N/A | N/A |
| 8-Jan-20 | OP | Complaint- Dining/EVS | N/A | N/A |
| 8-Jan-20 | BL | Annual | F812 | F |
| 10-Mar-20 | CR | Complaint-EVS | N/A | N/A |
| 16-Mar-20 | OP | Complaint-Dining | ongoing | ongoing |
| 16-Mar-20 | EL | Complaint-Dining | ongoing | ongoing |

62.     Indeed, since Morrison Living began, Lexington Health Network has received hundreds of complaints (from residents and staff) regarding Morrison Living's provision of the Services, and as a result of Morrison Living's failure to provide the Services, Lexington has lost substantial revenue from residents who have refused to stay due to Morrison Living issues. Lexington Health Network has communicated this to Morrison Living in writing, as well as orally.

63.     In addition to Morrison Living's absolute failure to provide the required Services, Morrison Living has endangered the safety and welfare of Lexington residents and employees. Beyond lack of sanitation in the kitchens and bathrooms and the serving of expired and raw foods,

Morrison Living employees have created multiple and significant hazards. Three examples of egregious Morrison Living conduct are outlined below:

64. First, Morrison Living's flagrant housekeeping violations have facilitated the spread of infections among Lexington residents. Multiple residents have contracted facility-acquired Clostridium Difficile, an infection associated with diarrhea, nausea, dehydration, and abdominal cramping. Another resident—a close family member of a local town's mayor—was exposed to unsanitary conditions, putting the resident at increased risk of infection.

65. Second, a Morrison Living employee left a water hose running over the weekend inside the building, causing the sprinkler room to be filled with water.

66. Third, a Morrison Living employee left a stove burner on overnight, which released gas into the healthcare facility, at the risk of starting a fire and explosion, in addition to exposure of potential health risks. Lexington called the fire department in response.

### Lack of Adequate Managerial Staff

67. When staffing the supervisory positions at the regional level and above, Morrison Living failed to provide stable, qualified supervisors. Instead, Morrison Living provided a revolving door of short-term, unqualified persons who made arbitrary and constantly changing demands. These persons lacked the skills and support from Morrison Living required to adequately supervise others, and failed to communicate with Morrison Living staff and Lexington employees. In addition, Morrison Living has yet to actually replace on a full-time basis the regional dining director, who left last November.

68. Morrison Living failed to furnish non-supervisory employees to execute the Services on-site at each community. On multiple occasions, Morrison Living was short-staffed and there were not enough staff to either serve food on time or to clean the living facilities as

required.  In addition, Morrison Living failed to provide Lexington with notice of new hires and also failed to provide Lexington with specific information as to which staff were scheduled to work each of the shifts.  For the inadequate number of staff that Morrison Living did supply, Morrison Living failed to provide the necessary training in order for the new hires and temporary staff to complete their responsibilities.  For example, Morrison Living employees lacked knowledge of how to disinfect the resident rooms and how to follow the isolation room cleaning procedures.

69.     Morrison Living's employees failed to perform their jobs in accordance with the requirements and standards set forth in the Agreement and Lexington's policies.

70.     In contrast and on multiple occasions, Morrison Living employees have been observed complaining in front of residents, swearing at residents, threatening the residents, and in general, behaving in an unacceptable manner.

71.     Finally, there have been recent incidents that demonstrate that Morrison Living has not followed standard procedures for hiring responsible and trustworthy employees.

72.     Morrison Living employees were involved in a scheme in which residents' checks were stolen from their rooms.  The mastermind of the scheme had a criminal background that should have come up in any standard background check performed by Morrison Living.  Morrison Living did perform background checks that failed to identify the criminal record of the scheme's mastermind.

73.     A Morrison Living employee was caught engaging in a lewd act while in an unoccupied resident room when the resident was not there.

### Other Examples of Agreement Violations by Morrison Living

74.     Other examples of Morrison Living's breaches of the Agreement include:

75.     Morrison Living failed to monitor and control their proposed budget.

76.     Morrison Living has refused to act in good faith and will not release certain invoices for Lexington to conduct cost comparisons.  For the invoices that Morrison Living has released, Lexington has identified significant errors in calculation.

77.     Morrison Living purchased certain equipment without Lexington's approval. Morrison Living then compounded the violation by discarding already existing equipment owned by Lexington.

78.     Again, this list is non-exhaustive and truly understates Morrison Living's systemic and pervasive failure to meet its obligations under the Agreement.

### III.     Morrison Living Committed Fraud to Conceal Its Malfeasance

79.     As if the substantial breaches were not enough, Lexington Health Network caught Morrison Living lying and attempting to conceal its malfeasance.

80.     For example, in July 2019, Morrison Living agents altered email communications before forwarding them to Lexington Health Network to falsely create the appearance that issues with the facilities had been resolved when they had not been resolved.

81.     Morrison Living's management refused to acknowledge this very serious issue.

### IV.     Lexington Health Network Terminated the Agreement

82.     As noted above, Lexington would be well within its rights to terminate the Agreement for cause under Article 3.2.

83.     Morrison Living has been more than aware of the issues above for quite some time, and the reality at this point is that there is no feasible way Morrison Living can cure its breaches.

84.     However, as a professional courtesy, Lexington terminated the Agreement on March 11, 2020 (*see* **Ex. 2**) under Article 3.1(ii), which permits terminations for convenience or

without cause if two conditions are met: (1) 90 days' notice is provided; and (2) the effective date of the Agreement is 1 year-old.

85. Lexington's termination was lawful under Section 3.1(ii) because it is making the termination effective June 9, 2020. Thus, both requirements (90 days' notice and one year from the Effective Date) will have been met by June 9.

86. The purpose of the 90-day termination period is obvious. It allows the Parties a reasonable time to transition the Services. A transition of this size cannot be effectuated in a matter of weeks, but rather will take several months, especially under the current conditions. It also allows the Parties to reach final payment terms and ensure that the residents – who are senior citizens – are provided with proper service.

87. Indeed, there are over 1,600 residents in the Lexington Health Network.

**V.    Morrison Engaged in Reprehensible Conduct After Being Terminated**

88. When Lexington Health Network terminated Morrison Living, Morrison Living began a bad faith pattern of misconduct.

89. Morrison Living first sent a pretextual, opportunistic, and bad faith letter claiming that it was entitled to terminate the Agreement on 7 days' notice. *See* **Ex. 3**.

90. This was plainly designed to harm Lexington Health Network and its senior citizen residents by short circuiting the 90-day termination period under Lexington Health Network's earlier termination.

91. There are number of legal problems with this attempted termination:

a. Under Section 2.1(c) of the Agreement, Lexington Health Network is permitted "to withhold payment on any invoiced amounts reasonably disputed." Lexington Health Network has always disputed (both in writing and orally) the amount that

Lexington has claims it is currently due. In fact, Lexington has been asking continuously for backup on the invoices, which Morrison is continuing to refuse to provide.

b. Morrison Living continues to claim that Lexington Health Network has waived its right to challenge these invoices, but that ignores the facts (they have already been challenged). Also, the Agreement contains a very important provision in Section 9.4: "No failure or delay on the part of either party in exercising any right or remedy under this Agreement shall operate as a waiver. No provision of this Agreement may be waived except specifically and in writing."

c. In addition, Section 3.1(iii) does not permit Morrison Living to terminate based on disputed sums. Indeed, the Agreement provides no written mechanism to resolve disputes over payment. Lexington Health Network has been working in good faith to resolve the disputes.

d. Illinois law, in any event, does not permit a party to use a termination provision opportunistically and in bad faith. As described above, the disputed sum has been at issue for several months, Morrison Living was fully aware the sum was disputed. Morrison Living never sent any termination notice or threat to terminate. Yet, after Lexington Health Network was constrained to terminate the Agreement because of all of Morrison Living's breaches, Morrison Living is simply trying to deploy Section 3.1(iii) to harass Lexington Health Network and short circuit the 90-day termination period required under Section 3.1 (ii).

92. Morrison Living has also claimed that, as part of its termination, it would not act to harm the employees or residents at the Lexington Health Network facilities.

93. This has proven to be another empty promise from Morrison Living. In fact, since it made that promise *a week ago*:

      a. Regulators were summoned to a Lexington Health Network facility because of yet another dining complaint for two facilities.

      b. Morrison Living ripped down signs that Lexington Health Network posted assuring workers they would be taken care of as part of the transition.

      c. Morrison Living has also attempted to transfer out key employees, like chefs, to harm Lexington Health Network during the Transition Period.

94. Lexington Health Network has offered Morrison Living compensation totaling over $7 million during the termination period, and offered to meet and confer with Morrison Living to reach a resolution on the final amounts due (which need to be offset to account for the damages to Lexington Health Network and account for improper and unapproved invoice amounts).

95. Morrison Living, however, continues to negotiate in bad faith and distract Lexington Health Network's management during the current crisis.

96. Morrison Living's ongoing misconduct must be stopped.

## COUNT I
### Declaratory Judgment

97. Plaintiffs adopt and incorporate by reference each of the allegations in paragraph 1 through 96 as if set forth fully herein.

98. Lexington Health Network and Morrison Living are Parties to the Agreement.

99. Lexington Health Network lawfully terminated the Agreement on March 11, making the effective date of the termination June 9, 2020.

100. There is a substantial controversy between Lexington Health Network and Morrison Living as to whether Morrison Living's attempted retaliatory termination is valid

because: (1) the Agreement does not permit Morrison Living to terminate based on disputed amounts and, (2) alternatively, under Illinois law Morrison Living's attempted termination is opportunistic, in bad faith, and retaliatory.

101.    Lexington Health Care has at all times complied with all the terms and conditions set forth in the Agreement.

102.    Lexington Health Care has at all times objected to and reserved its rights regarding the disputed sums and the breaches of the Agreement by Morrison Living.

WHEREFORE, Lexington Health Network respectfully requests that the Court enter a judgment for Lexington Health Network and against Morrison Living including the following relief:

A.    A Declaration that Morrison Living's attempted termination is invalid.

B.    Morrison Living is preliminarily and permanently enjoined from abandoning the Lexington Health Network during the 90-day termination period and not providing the Services through June 9, 2020.

C.    Ordering Morrison Living to pay Lexington Health Network's attorneys' fees and costs.

D.    Ordering any such further relief that the Court deems necessary or appropriate or which Lexington Health Network is entitled to as a matter of law or equity.

## <u>COUNT II</u>
**Breach of the Agreement and Covenant of Good Faith and Fair Dealing**

103.    Plaintiff adopts and incorporates by reference each of the allegations in paragraph 1 through 102 as if set forth fully herein.

104.    Morrison Living has breached the Agreement as set forth herein.

105.    As a consequence of Morrison Living's numerous and ongoing breaches of the Agreement, including the implied covenant of good faith and fair dealing under Illinois law, Lexington Health Network has suffered, and continues to suffer, substantial financial damages and equitable harm, as well as attorneys' fees and costs.

106.    The Agreement provides for an award of attorneys' fees and costs in connection with enforcing the terms of the Agreement.

107.    Lexington Health Network has at all times complied with all the terms and conditions set forth in the Agreement.

108.    Lexington Health Network has at all times objected to and reserved its rights regarding the disputed sums and the breaches of the Agreement by Morrison Living.

WHEREFORE, the Lexington Health Network respectfully requests that the Court enter a judgment for the Lexington Health Network and against Morrison Living including the following relief:

A.    Actual damages in an amount exceeding $75,000.00;

B.    Attorneys' fees and costs; and

C.    Any other relief the Court deems just and proper.


DATED:    March 24, 2020            Respectfully submitted,

/s/ Scott M. Ahmad
Scott M. Ahmad
Joseph E. Becker
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone: (312) 558-5600
Email: sahmad@winston.com
Email: jebecker@winston.com

*Counsel for Lexington Health Network*