**IN UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEXINGTON HEALTHCARE CENTER OF BLOOMINGDALE, INC. *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 20-cv-01949 |
| vs. | ) ) | Hon. Robert W. Gettleman |
| MORRISON MANAGEMENT SPECIALISTS, INC. | ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) | |

**MOTION FOR A TEMPORARY RESTRAINING ORDER
OR PRELIMINARY INJUNCTION**

This motion seeks to stop Morrison Living, a corporate conglomerate, from executing on a heavy-handed strategy to leave 1,600 senior citizens without food and cleaning services during the Coronavirus crisis. Morrison's conduct is reprehensible.

Plaintiffs ("Lexington Health Network") hired Morrison a year ago to provide "Dining Services" and "Housekeeping and Laundry Services" for senior living facilities within the Lexington Health Network. Lexington Health Network was compelled to terminate the Parties' Agreement (the "Agreement") after Morrison repeatedly breached it. Morrison's breaches are too numerous to list in this introduction, but include serving undercooked food (pictures included *infra*), letting trash pile up, causing over 10 regulatory infractions, and falsifying email records to conceal its misconduct.

As a professional courtesy, Lexington terminated Morrison under the Agreement's termination for convenience clause, which provides for a 90-day termination period so the complex services can be transitioned, final invoices and payments can be reconciled, and the senior citizens can be cared for. The end of the termination period, as of the date of this filing, is June 9, 2020.

Morrison responded in bad faith. It attempted to one-up Lexington, claiming it could terminate the Agreement on just 7 days' notice and the leave the residents without food and

cleaning thereafter.  Morrison has made this claim to harass Lexington, which is evidenced by the fact that they made admissions in letters to their employees acknowledging that the Agreement does not terminate until June 9, 2020.  Morrison also claimed that it would not harm any residents or employees, a claim that quickly turned out to be erroneous.  Morrison has failed to cooperate and align on transition efforts and intimidated lower-level employees.  Then, this week, Morrison started making threats about leaving after April 1 (or even earlier) unless Lexington capitulated to extraordinary and extra-contractual demands.  Morrison's claim that the Services can be transitioned in just 7 weeks is also belied by the fact that it took Morrison itself at least 5 months to transition into the Lexington Network.

This motion presents a narrow legal question: whether the Court should issue a TRO or preliminary injunction prohibiting Morrison's retaliatory, invalid termination during the Coronavirus Crisis.  The answer is yes.

Lexington Health Network has satisfied each of the TRO / preliminary injunction elements. First, Lexington has a reasonable likelihood of success on merits.  Lexington timely paid Morrison almost $10 million under the Parties Agreement.  Morrison will continue to be paid during the termination period (Lexington just today made checks available to them totaling $750,000) and, once the terms and amounts are resolved, Morrison will be compensated for the amounts it now incorrectly claims are past due.  Lexington lawfully terminated the Agreement under Article 3.1(ii), which does not require any cause.  It is a bilateral termination for convenience right, and requires a 90-day termination period.

In contrast, Morrison claimed, only in response to Lexington's termination notice, that it was entitled to terminate the Agreement under Article 3.1(iii) based on amounts that have been disputed for many months, that Morrison's principals have been well aware of, and that Lexington has been asking to be validated through supporting documentation before working out payment terms.  Morrison's termination is invalid for several reasons, including that Article 3.1(iii) does not permit Morrison to terminate based on disputed sums.  Illinois law also precludes parties from

using contractual terms pretextually and in bad faith, which is exactly what Morrison is doing here (and while knowingly placing 1,600 senior citizens in harm's way).

Second, Lexington's damages claim for Morrison's improper termination attempt will not be adequate. Morrison's attempted termination would be catastrophic to Lexington's business and its residents. The balance of harms favors an injunction. Lexington has offered to compensate Morrison over $7 million during the termination period, which exceeds Morrison's purported costs by approximately $1.5 million. Lexington has already began making these payments.

Finally, the public interest supports an injunction. In normal circumstances, it is against the public interest to terminate a contract unlawfully, abandon a senior living facility and leave the residents without access to food and cleaning services. In the midst of a global pandemic, however, where seniors constitute the highest-risk population, Morrison's pretextual and heavy-handed walkout is reprehensible.

This motion is supported by the pleadings, as well as the affidavit of Fred Benjamin (the "Benjamin Affidavit") (attached as **Exhibit 1**), the Chief Operating Officer of Lexington Health Network. Lexington Health Network respectfully urges the Court to order a TRO or preliminary injunction as follows: Morrison shall be enjoined during the termination period (from now until June 9, 2020) from failing to provide the Services, and Lexington will compensate Morrison during the termination as described more specifically in the Benjamin Affidavit.

## STATEMENT OF FACTS

### I.    Lexington Health Network

Lexington Health Network has operated senior healthcare centers and nursing homes in the Chicagoland area since 1984. (ECF No. 1, Compl. ¶ 2.) For over 35 years, Lexington has enjoyed a strong reputation among the community, its residents and their families. Lexington has worked tirelessly to create excellent living communities for its residents, supported by personal attention to residents, careful oversight, adequate staffing and managerial support, standard operating procedures and practices, and strong internal controls. (*Id.* at ¶ 25.)

## II. Lexington Health Network Retained Morrison to Provide Food, Cleaning, Laundry, and Housekeeping Services

In or around 2017, Lexington Health Network began searching for a food service, cleaning, laundry, and housekeeping vendor to maintain and even further Lexington's established reputation and success. (*Id.* at ¶ 26.) Morrison Living represented that it was a premier, experienced hospitality group and pitched itself as having world class expertise in activities such as operating and managing dining services, housekeeping and laundry services. (*Id.* at ¶ 27.) Morrison also touted the fact that it is a member of Compass Group, a food service company that made approximately $25 billion in revenue last year. (*Id.* at ¶ 28.) Morrison Living's website proclaims that, for 100 years, it has been "been serving delicious food and providing superior hospitality services." (*Id.* at ¶ 29.)

## III. Morrison Breached the Agreement

Based on Morrison Living's representations, the Parties executed an Agreement, effective June 1, 2019. (Agreement, ECF No. 1, at Ex. 1). Pursuant to the Agreement, Morrison's obligations are to, among other things, "operate and manage the dining services department ("Dining Services") and housekeeping and laundry departments ("Housekeeping and Laundry Services")," including, but not limited to, the following: managing personnel, procuring food and supplies, managing personal clothing, and cleaning the Lexington facilities. (Agreement at Introduction; Compl. at ¶ 34.) Lexington has so far paid millions of dollars to Morrison under the Agreement. (Compl. at ¶ 35.)

Unfortunately, Morrison Living has violated the Agreement at its most fundamental level. This is well-documented. (*Id.* at ¶ 36.) Indeed, Lexington Health Network has provided specific and repeated oral and written notice to Morrison Living of Morrison's extensive violations of the Agreement. Even following specific and repeated notice, Morrison failed to improve. (*Id.* at ¶ 37.) A non-exhaustive list of incurable material breaches is set out below:

**Food Service:** The food is often serviced 30 minutes late, and on multiple occasions, Morrison failed to provide a sufficient quantity of food for all of the residents to be able eat. (*Id.* at ¶ 40.) Morrison's failure to provide food service has raised serious health risks. By way of

example: Morrison has failed to provide diabetics with medically necessary snacks and food items (*Id.* at ¶ 41); Morrison has left the kitchen and dining halls in filthy conditions (*Id.* at ¶ 42); Morrison has failed to label food, raising significant concerns for residents with food allergies (*Id.*); Morrison has provided residents with expired food items (*Id.* at ¶ 43); Morrison has provided residents with undercooked meat and eggs (*Id.*); and Morrison employees have failed to take appropriate sanitation measures while preparing food (*Id.* at ¶ 44). The following pictures illustrate the inadequate food service provided by Morrison (*Id.* at ¶ 45):

 

**Cleaning Responsibilities:** Some of Morrison Living's most reprehensible conduct involves its failure to keep the facilities clean. Morrison clearly violated its cleaning obligations, as well as the cleaning frequency schedule detailed in Exhibit A of the Agreement. (*Id.* at ¶ 48.) On multiple occasions, the dining halls, stairwells, resident bedrooms, and bathrooms were not cleaned, and Morrison Living failed to complete the relevant cleaning checklists. (*Id.* at ¶ 49.) Cleaning failures include, but are not limited to, the following: dirty counters in the serving areas; stained and sticky floors; failing to remove trash in residents' bedrooms; and failing to wash the windows and privacy curtains in the residents' bedrooms. (*Id.* at ¶ 52.) Additional failures include: failure to replace hand soap, toilet paper and paper towels in the bathrooms (*Id.* at ¶ 43); and allowing overwhelming pile-up of trash (*Id.* at ¶ 56). The following pictures provide examples of trash pile-up (*Id.*):

 

**Failure to Comply with Federal and State Regulations:** Morrison Living has also failed to operate the dining and housekeeping services in compliance with all applicable federal and state regulations. (*Id.* at ¶ 57.)  Since retaining Morrison, Lexington has received a total of eleven citations from the Illinois Department of Health related to dining and housekeeping services. (*Id.* at ¶ 61.)  The table below identifies the eleven citations *(Id.)*:

| Date of Survey | Facility | Type of Survey | Citation | Scope/Severity |
|---|---|---|---|---|
| 6-Jun-19 | LO | Complaint- Dining | F805 | E |
| 6-Jun-19 | LO | Complaint- Dining | F812 | F |
| 17-Jul-19 | LO | Annual | F692 | E |
| 17-Jul-19 | LO | Annual | F800 | D |
| 17-Jul-19 | LO | Annual | F803 | E |
| 9-Aug-19 | OP | Complaint- EVS | F584 | E |
| 9-Aug-19 | OP | Complaint- Dining | F804 | E |
| 13-Aug-19 | CR | Complaint- EVS | N/A | N/A |
| 11-Sep-19 | LG | Complaint- Dining | N/A | N/A |
| 1-Oct-19 | SC | Complaint- Dining/EVS | N/A | N/A |
| 21-Nov-19 | CR | Complaint-EVS | N/A | N/A |
| 11-Dec-19 | SC | Annual | F803 | E |
| 11-Dec-19 | SC | Annual | F812 | F |
| 11-Dec-19 | CR | Complaint-EVS | N/A | N/A |
| 19-Dec-19 | CR | Complaint- Dining | F805 | D |
| 7-Jan-20 | LO | Complaint- Dining | N/A | N/A |
| 8-Jan-20 | OP | Complaint- Dining/EVS | N/A | N/A |
| 8-Jan-20 | BL | Annual | F812 | F |
| 10-Mar-20 | CR | Complaint-EVS | N/A | N/A |
| 16-Mar-20 | OP | Complaint-Dining | ongoing | ongoing |
| 16-Mar-20 | EL | Complaint-Dining | ongoing | ongoing |

**Lack of Adequate Managerial Staff:** Morrison Living has also failed to provide stable, qualified supervisors and non-supervisory employees. Instead, Morrison provided a revolving door of short-term, unqualified persons who made arbitrary and constantly changing demands and were unable to complete the agreed upon services. (*Id.* at ¶ 67.) On multiple occasions: Morrison was short-staffed and unable to either serve food on time or to clean the living facilities as required; Morrison failed to provide Lexington with notice of new hires and shift schedules; Morrison failed to provide the necessary training for Morrison staff. (*Id.* at ¶ 68.) Of particular concern, Morrison Living employees have been observed complaining in front of residents, swearing at residents, threatening the residents, and in general, behaving in an unacceptable manner. (*Id.* at ¶ 70.) Finally, Morrison employees were involved in a scheme to steal checks from the rooms of various residents. (*Id.* at ¶ 72.)

**Fraudulent Concealment:** As if substantial breaches were not enough, Morrison agents have been caught falsifying emails to conceal their misconduct. (*Id.* at ¶¶ 79–80.) When caught red-handed, Morrison's management refused to acknowledge this very serious issue. (*Id.* at ¶ 81.)

## IV.     Lexington Disputes Morrison's Claim About Outstanding Payments

Lexington has paid Morrison millions of dollars since the Agreement was in place, including $1.5 million in late-February. (Benjamin Aff. ¶ 10.) At the same time, there is a separate receivable amount that Lexington disputes. (*Id.* at ¶ 11.) Indeed, Article 2.1(c) of the Agreement explicitly permits Lexington to withhold amounts reasonably disputed. However, the Agreement, unlike some other agreements, does not provide a mechanism to resolve issues relating to invoices. Lexington and Morrison have been in discussions towards resolving the outstanding invoice issue, but Morrison has refused to provide any backup for the invoices. (*Id.* at ¶¶ 11–16.)

## V.     Lexington Health Network Terminated the Agreement

Morrison Living has been more than aware of the issues above for quite some time, and at this point, there is no feasible way Morrison Living can cure its breaches. (*Id.* at ¶ 17.) As a professional courtesy, Lexington terminated the Agreement on March 11, 2020 under Article 3.1(ii), which allows for termination by either party without cause, provided that the termination

meets the following two requirements: 1) the first anniversary of the Effective Date has passed, and 2) the party seeking termination provides at least ninety days' written notice. (*Id.* at ¶ 18.)

Under the Agreement, the Effective Date was June 1, 2019 and thus the first anniversary of the Effective Date will be June 1, 2020. (*Id.* at ¶ 19.) Lexington provided written notice to Morrison of the termination on March 11, 2020. (*Id.* at ¶ 18.) The termination thus takes effect ninety days later on June 9, 2020, exactly eight days after the first anniversary of the Effective Date. (*Id.* at ¶¶ 18–20.)

## VI. Morrison Engaged in Reprehensible Conduct After Being Terminated

When Lexington Health Network terminated Morrison, Morrison began a bad faith pattern of misconduct. (Compl. ¶ 88.) Morrison Living sent a pretextual, bad faith letter claiming that it was entitled to terminate the Agreement on seven days' notice. (*Id.* at ¶ 89.) This was plainly designed to harass Lexington Health Network and its senior citizen residents by claiming that it could short-circuit the ninety-day termination period under Lexington Health Network's earlier termination. (*Id*. at ¶ 90.)

Morrison's bad faith claim of a seven-day termination period is even evidenced by the fact that it wrote a letter to certain of its employees admitted that it expected the termination period to end on June 9, 2020. (Benjamin Aff. ¶ 21.) While that letter was designed to scare the employees into thinking that Lexington would not be retaining them after the termination period, the fact remains that Morrison has fully admitted and acknowledged the June 9, 2020 termination date. (*Id.*)

Second, Morrison Living has stepped up efforts to intentionally and maliciously breach the Agreement within Lexington facilities. (Compl. ¶ 93.) For example:

- Morrison Living ripped down signs that Lexington Health Network posted assuring workers they would be taken care of and hired by Lexington as part of the transition. In the middle of Coronavirus crisis, it really does not get any lower than scaring and intimidating front line employees. (*Id.*)

- Morrison Living has also attempted to transfer out key employees, like chefs, to harm Lexington Health Network during the Transition Period. (*Id.*)

Third, Morrison living has misstated the amounts allegedly due under the Agreement, and negotiated in bad faith the last several weeks. To make matters worse, Morrison stated in writing in its invalid termination letter that it would not act to harm the Plaintiffs' residents and employees during the transition of services. However, Morrison has reneged on that commitment and said it will no longer keep even that basic promise beyond April 1 (or even possibly earlier) at this point.

Finally, as described in the Benjamin affidavit, Morrison has grossly overstated the scope of this dispute. In the short term, Morrison has complained that it cannot continue to perform the Services for less than $5.6 million, but Lexington has offered much more than that. (Benjamin Aff. ¶¶ 9, 27.) And Lexington just today made available by checks totaling $750,000 the first installment payment. (*Id.* ¶ 9(b).) Any claims by Morrison that it is not getting compensated during the transition period are simply false. The non-emergency claims (Lexington's claim for damages and Morrison's claim for allegedly past due amounts) can be litigated after getting through this complex termination period during the Coronavirus crisis or even resolved through a private settlement before the end of the termination.

## **ARGUMENT**

The Agreement contains an Illinois choice of law provision. The TRO / preliminary injunction elements are: (1) a reasonable likelihood of success on the merits, (2) no adequate legal remedy, (3) irreparable harm absent injunctive relief, (4) the harm to aggrieved party, on balance, outweighs the harm to the enjoined party, and (5) no harm to the public interest. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). Lexington Health Network plainly satisfies all of the elements.

## I. Lexington Health Network has a reasonable likelihood of success on the merits.

Lexington Health Network is reasonably likely to prevail on its claim that Morrison's termination under Article 3.1(iii) is invalid under both the Agreement and Illinois law. Though this basis alone is sufficient for a preliminary injunction, Lexington is also likely to prevail on the claim that it rightfully terminated the Agreement.

**A. Lexington rightfully terminated the Agreement under Article 3.1(ii) and is entitled to 90-day termination period.**

Under Illinois law, "if a contract is clear and unambiguous, the court must determine the intent of the parties solely from the plain language of the contract." *Hanover Ins. Co. v. N. Bldg. Co.,* 751 F.3d 788, 792 (7th Cir. 2014) (citing *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 782 (Ill. App. Ct. 1999)). Here, the contractual language is clear and unambiguous. Article 3.1(ii) provides as follows:

> **Term.** The initial term of this Agreement will extend from the Effective Date for a period of five (5) years, unless earlier terminated . . . by either party without cause provided that (1) the first anniversary of the Effective Date has passed and (2) the party seeking such termination provides at least ninety (90) days prior written notice to the other party.

Lexington Health Network has complied with both requirements of Article 3.1(ii). First, the termination is effective after the first anniversary of the Effective Date and second, Lexington provided ninety days' written notice. Under the Agreement, the Effective Date was June 1, 2019 and thus the first anniversary of the Effective Date will be June 1, 2020. (Benjamin Aff. ¶ 19.) Lexington provided notice to Morrison of the termination on March 11, 2020. (*Id.* at ¶ 18.) The termination thus takes effect 90 days later on June 9, 2020, exactly 9 days after the first anniversary of the Effective Date. *(Id.* at ¶ 19.)[1]

The 90-day termination period is also a material and unambiguous term with an apparent purpose. Transitioning the food, housekeeping, and cleaning services (which includes personnel transitions, purchasing, training, and other activities) cannot be accomplished in a matter of weeks. (Benjamin Aff. ¶ 23.) The 90-day termination allows for a reasonable time to transition, reach final payment terms, and ensure that the senior citizen residents are given appropriate care. (Compl. ¶ 86.)

---

[1] Lexington could have terminated the Agreement for cause as well, but elected to terminate Morrison for convenience as a professional courtesy. Lexington, of course, reserved its damages claims, as stated in its termination letter and provided for by Article 9.4 of the Agreement. Those damages claims, however, need not be resolved at this point. Lexington also has reserved its right to terminate Morrison for cause.

**B.** **Morrison's seven-day termination notice is invalid under both the plain language of the Agreement and also under Illinois law.**

Morrison Living alleges Lexington Health Network failed to pay amounts due and thus, Morrison is entitled to terminate the Agreement by providing a seven-day notice under Article 3.1(iii). Morrison's interpretation of Article 3.1(iii) is incorrect. First, Lexington Health Network does not have any amounts due to Morrison at this point because Lexington is entitled to withhold payments under the Agreement that are disputed. Lexington has already paid Morrison millions under the Agreement, and the amount allegedly due at this point is disputed in good faith, which Morrison has been fully aware of for quite some time. (Benjamin Aff. ¶¶ 10–16.) Second, Morrison is prohibited from terminating the Agreement based on the disputed amounts under both the Agreement and Illinois law.

**1.** **Under the plain language of the Agreement, Lexington Health Network may withhold payment on any invoiced amount reasonably disputed in good faith.**

Again, the plain language of the contract controls. *Hanover Ins. Co.*, 751 F.3d at 792. The contractual language expressly allows Lexington Health Network to withhold payment on any invoiced amount reasonably disputed in good faith. Article 2.1(c) provides that Lexington Health Network "may withhold payment on any invoiced amounts reasonably disputed in good faith." Lexington only "agrees to pay all item(s) not in dispute timely," in accordance with the Agreement.

In accordance with Article 2.1(c), Lexington has withheld reasonably disputed payments in the following circumstances: First, where Lexington has identified significant errors in calculation on Morrison invoices. (Benjamin Aff. ¶¶ 12–13.) Second, where Morrison has stated the total amount due, but refused to release specific invoices and receipts to Lexington, even after repeated requests from Lexington that Morrison release them. (*Id.* at ¶¶ 14–15.) Where Morrison has willfully refused to even release the receipts, Lexington has particular interest in verifying Morrison's calculations given that Lexington has identified significant calculation errors on the invoices that Morrison has released. In both of these circumstances, Lexington has provided

Morrison with written notice and an explanation regarding the disputed amounts and Lexington has acted in good faith to withhold payments and try to resolve them. Morrison's executives have been well aware of this dispute, and have themselves been involved in discussions to resolve them. (*Id.* at ¶¶ 13, 15.) Not once during those conversations did they allege that they did not receive proper notice of the disputed sums. For as long as these amounts remain in reasonable dispute, Lexington may withhold payment under the plain language of the contract. And, still, Lexington has already paid Morrison millions of dollars under the Agreement, including paying $1.5 million in late February and making checks available today totaling $750,000. (*Id.* at ¶ 9(b).)

### 2. The plain language of the Agreement prohibits Morrison Living from terminating the Agreement based on a seven-day notice.

Morrison has relied on Article 3.1(iii) in bad faith, to justify its seven-day termination notice. Article 3.1(iii) provides as follows:

> **Term.** The initial term of this Agreement will extend from the Effective Date for a period of five (5) years, unless earlier terminated . . . by Morrison upon seven (7) days prior written notice if the Client fails to pay any amounts due within sixty (60) days from the date of Morrison's billing (subject to the Client's right to cure prior to the end of the seven (7) day notice period).

Here, again, the plain language of the contract controls. Under Article 2.1(c), Lexington withheld payments on "amounts reasonably disputed." Under Article 3.1(iii), Morrison Living demands "amounts due." The plain language of the contract provides two distinct terms—an *amount reasonably disputed* under Article 2.1(c) does not constitute an *amount due* under Article 3.1(iii). Quite simply, the reasonably disputed payments withheld by Lexington under Article 2.1(c) are entirely irrelevant to Article 3.1(iii).

Morrison argues that "amounts due" necessarily encompass "amounts reasonably disputed." This reading is problematic for two reasons. First, it renders Article 2.1(c) meaningless and second, it leads to an absurd result.

First, courts "must not interpret a contract in a manner that will render any provision meaningless." *Sears, Roebuck & Co. v. Tyco Fire Prods. LP*, 833 F. Supp. 2d 892, 905 (N.D. Ill.

2011) (citing *Wolfensberger v. Eastwood*, 889 N.E.2d 635, 638 (Ill. App. Ct. 2008)). Morrison's reading of the Agreement renders Article 2.1(c) entirely meaningless. Under Morrison's reading, as soon as Lexington disputed a payment, Morrison could threaten to terminate the contract. Lexington would have no power to dispute a payment and if Lexington so much as reasonably disputed a payment in good faith, it would be tantamount to material breach. Thus, under Morrison's reading, Article 2.1(c) loses all power under the Agreement and is rendered entirely meaningless.

Second, courts "construe contracts so as to avoid absurd results." *Horbach v. Kaczmarek*, 988 F. Supp. 1126, 1129 (N.D. Ill. 1997) (citing *Foxfield Realty v. Kubala*, 678 N.E.2d 1060, 1063 (Ill. App. Ct. 1997)). In this case, in particular, Morrison's reading leads to truly absurd results. Morrison miscalculated certain invoices, and for other payments, Morrison has willfully refused to show the receipts to Lexington. Ironically for Morrison, the amounts in dispute are not due to any action on the part of Lexington. Rather, the disputes stem exclusively from Morrison's misconduct and willful refusal to furnish the receipts. Under Morrison's reading, Morrison has engaged in willful misconduct and then used that misconduct to justify action against Lexington— allowing Morrison to then proceed against Lexington based on Morrison's own misconduct would create an absurd result. Based on the plain language of the Agreement, Morrison Living cannot terminate the Agreement under Article 3.1(iii).

### 3. Illinois law prohibits Morrison Living from terminating the Agreement based on a seven-day notice.

Under Illinois law, a "party can stand on his contract rights; what he cannot do is resort to opportunistic or otherwise improper behavior in an effort to worm his way out of his contractual obligations." *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 589 (7th Cir. 2000) (analyzing *Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 974 (Ill. App. Ct. 1984)). Morrison Living has done exactly that—relied on Article 3.1(iii) opportunistically, in attempt to worm its way out of contractual obligations during the termination period and cause Lexington and its residents substantial harm. For months, Lexington Health Network has withheld reasonably

disputed payments—but for months Morrison has ignored these withheld payments. For months, Lexington has attempted to resolve the disputes by repeatedly requesting that Morrison provide copies of the missing receipts—but for months, Morrison has failed to furnish receipts. (Benjamin Aff. ¶¶ 11–16.) Then, suddenly, after months of inaction, Morrison invoked Article 3.1(iii) in response to Lexington's valid ninety-day notice. (*Id.* at ¶ 20.) It is also important to note that, while Morrison was asserting it could abandon its contractual obligations, it wrote a letter to its employees admitting that the actual termination period ending date is June 9, 2020. (*Id.* at ¶ 21.)

The timeline of events show that Morrison acted opportunistically, in bad faith, and that Morrison seeks to avoid its contractual obligation to continue providing Services for the ninety-day notice period. Ultimately, Morrison seeks to punish Lexington by abandoning the senior facilities, and leaving the residents without food and cleaning services after just seven days' notice. Morrison cannot rely on Article 3.1(iii) in an attempt to worm out of its contractual obligations.

## II. The other injunction requirements are met.

The Seventh Circuit has explained that the process of awarding a TRO or preliminary injunction "involves engaging in . . . the sliding scale approach; the more likely [a] plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc.*, 237 F.3d at 895. In this case, the balance of irreparable harms overwhelmingly favors Lexington Health Network even without the sliding scale, which still applies.

As it currently stands, Morrison Living provides essential food and cleaning services in over ten different Lexington Health Network facilities. (Benjamin Aff. ¶ 23.) Spread across these facilities, at least 1,600 senior citizens rely on Morrison every single day for access to food and cleaning services. (*Id.*) Though Morrison Living has failed repeatedly to provide adequate food and cleaning services, Morrison is still essential to the daily operation of Lexington's facilities. If Morrison were to abandon its responsibilities on seven days' notice, it would be impossible for Lexington to hire and train the necessary staff to care for its residents on such a short time frame, particularly given the Coronavirus (*Id.* at ¶¶ 23-25.) The resulting harm would be irreparable and immense: while Lexington would scramble to replace the vacuum left by Morrison, Lexington's

residents would be left without access to food and cleaning services. In a normal context, Morrison's threat to abandon thousands of seniors is reprehensible. In a normal context, Morrison's threat places the health and safety of the Lexington's residents at great risk. This is not to mention the immeasurable harm to Lexington's reputation within the community. *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 680 (7th Cir. 2012).

Today, however, is not a normal context. Acting in bad faith and in clear violation of both the Agreement and Illinois law, Morrison has threatened to leave thousands of seniors without access to food and cleaning services in the midst of the Coronavirus pandemic, the greatest health crisis of our time. Lexington's residents are primarily all senior citizens—they represent a high-risk population and the spread of Coronavirus through a senior living facility could be catastrophic. (Benjamin Aff. ¶ 24.) Lexington is on the front lines of the fight against Coronavirus, with a grave responsibility to protect thousands of Illinois' most vulnerable residents.

The irreparable harm is immense: not just reputational harm to Lexington, but the possibility of physical harm to Lexington's residents. There is no adequate legal remedy to a devastated reputation and the risk of physical harm. The balance of harms between the parties also supports a preliminary injunction. Morrison purports that its costs are approximately $5.6 million for the ninety-day period. (*Id.* at ¶ 27.) Lexington has offered to compensate Morrison much more than $5.6 million during the termination period. (*Id.* at ¶ 9.) Still, Morrison rejected Lexington's offer, and continues to threaten Lexington's residents and employees. The bottom line is that Morrison will not suffer harm during the termination period.

Finally, and without question, the public interest demands a preliminary injunction. In normal circumstances, it is against the public interest to abandon a senior living facility and leave the residents without access to food and cleaning services. In the midst of a global pandemic, however, where seniors constitute the highest-risk population, Morrison's pretextual and heavy-handed walkout is reprehensible.

## **CONCLUSION**

For these reasons, Lexington urges the Court to grant the relief requested herein.

DATED:     March 25, 2020     Respectfully submitted,

<u>/s/ Scott M. Ahmad</u>
Scott M. Ahmad
Joseph E. Becker
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone: (312) 558-5600
Email: sahmad@winston.com
Email: jebecker@winston.com

*Counsel for Lexington Health Network*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 25th day of March, 2020, I caused a true and correct copy of the foregoing to be filed via CM-ECF.  I also emailed a copy to counsel for the Defendant, who has yet to appear, but has asked to be provided any filings in the interim.

By:   */s/ Scott M. Ahmad*