**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEXINGTON HEALTHCARE CENTER ) | | |
| OF BLOOMINGDALE, INC. *et al.*, ) | | |
| ) | Case No. 20-cv-1949 | |
| Plaintiff, ) | Judge Robert W. Gettleman | |
| ) | | |
| v. ) | Case No. 20-cv-1792 | |
| ) | Emergency Judge Robert M. Dow, Jr. | |
| MORRISON MANAGEMENT ) | | |
| SPECIALISTS, INC, ) | | |
| ) | | |
| Defendants. ) | | |

**MEMORANDUM OPINION AND ORDER**

For the reasons set forth below, Plaintiff's motion for a temporary restraining order ("TRO") [12] is granted. 1,600 senior citizens need adequate food, clean laundry, and sanitized living spaces right now. The parties can sort out disputed invoices and contract terminations later. For the next 14 days, the Court will hold the parties to their agreement, which 1,600 of our country's most vulnerable residents are depending on: Defendant will provide the services it agreed to provide, and Plaintiff will pay for those services. Specifically, the Court orders the following for the period of April 10, 2020, through April 24, 2020:

1. Defendant is temporarily enjoined and restrained from terminating its contract with Plaintiff or ceasing to provide services at Plaintiff's facilities. Defendant shall continue to provide services to Plaintiffs consistent with the parties' ordinary course of dealing.

2. Plaintiffs shall make the following payments by wire transfer or certified check to Defendant, which will be reconciled against actual charges:

    a. $500,000.00 on or before April 16, 2020; and

    b. $500,000.00 on or before April 23, 2020.

3. Plaintiff, through counsel, shall deposit with the Court ten thousand dollars ($10,000.00), either cash, check, cashiers' check, certified funds, or surety bond, as security to be held in the Court Registry.

4. This case is set for a telephonic status hearing on April 22, 2020 at 1:30 p.m. The Courtroom Deputy will provide a call-in number by email.

5. Before the April 22, 2020 hearing, the Court requests that the parties confer in good faith regarding a mutually agreeable plan and schedule for transitioning Plaintiff's facilities from Defendant to the new service provider.

6. Two days prior to the next hearing, the parties are ordered to submit a joint status report updating the Court on: the parties' compliance with this order; Plaintiff's progress in transitioning to a new service provider; the parties' discussions requested by Paragraph 5; and whether circumstances justify extending this order for an additional 14 days.

### I. Background[1]

Plaintiff Lexington Health Network has operated senior living centers and nursing homes in the Chicagoland area since 1984. Lexington Health Network retained Defendant Morrison Living to provide food, cleaning, laundry, and housekeeping services at the Lexington Health Network facilities. Pursuant to the parties' contract, Defendant's obligations are to, among other things, "operate and manage the dining services department ("Dining Services") and housekeeping and laundry departments ("Housekeeping and Laundry Services")," including, but not limited to, the following: managing personnel, procuring food and supplies, managing personal clothing, and cleaning the Lexington facilities. [1, at ¶ 34.] Defendant began providing services for

---

[1] The information in this section is drawn from Plaintiff's Complaint [1] and the briefs and other materials that the parties submitted in support of and opposition to Plaintiff's motions for a TRO [5, 8, 12, 16, 17, 18].

2

approximately 1,600 senior citizens at 11 Lexington facilities on the contract's effective date, June 1, 2019.

Since then, things have not gone smoothly. Plaintiff claims that Defendant's services have been quite poor, including undercooked food, trash piling up, and uncleaned resident living spaces and common spaces, to the point of breaching the contract. Defendant counters that Plaintiff has refused to pay more than $5 million in invoices, did not provide written notice of disputed invoice amounts, misled Defendant about the workforce available for Defendant to hire, and left facilities in unsanitary conditions when it turned over cleaning responsibilities to Defendants.

Plaintiff purports to have invoked its right to terminate the contract on March 11, 2020, under Article 3.1(ii), which allows termination without cause, provided that (1) the first anniversary of the Effective Date (June 1, 2019) has passed and (2) the party seeking such termination provides at least 90 days' prior written notice to the other party. Plaintiff says it provided the 90 days' notice and the contract will terminate on June 9, 2020, with the intervening time as a period to transition services away from Defendant. Plaintiff asserts that Defendant is obligated to continue providing services during that transition period and that it is willing to pay for those services, as required by the contract. Plaintiff also states that it has already retained a replacement service provider and is accelerating the transition to the new provider. [12, at 8.] Plaintiff expects to transition four facilities to the new provider and away from Defendant by May 10, three more facilities by May 17, and the final four facilities by June 7. [*Id*.]

Defendant claims to have invoked Article 3.1(iii) on March 17, 2020, which allows' Defendant to terminate the contract on seven days' written notice for Plaintiff's failure to pay certain past-due amounts. See [16 at 27].

On March 24, 2020, Plaintiff filed a complaint [1] that asserts claims for: declaratory judgment that Defendant's purported termination of the contract is invalid (Count I); and breach of contract and covenant of good faith and fair dealing (Count II). On March 25, 2020, Plaintiff filed its first motion for a temporary restraining order ("TRO") or preliminary injunction [5] asking the Court to prohibit Defendant's termination of the contract during the coronavirus crisis. The parties agreed to a stand-still order [8] entered on March 26, 2020, which required Defendant to provide services for two additional weeks, and Plaintiff to pay for those services, while the parties attempted to resolve their differences. The order did not find either party to be a prevailing party, and both sides reserved all rights.

On April 6, 2020, Plaintiff filed a motion for a temporary restraining order ("TRO") or preliminary injunction [12] that would require Defendant to continue providing services for up to 45 days as Lexington transitions to a new vendor. [12 at 1]. That motion has been assigned to the undersigned, acting as emergency judge under the procedures in effect during the current worldwide public health emergency.

In that regard, for the past several weeks, the novel coronavirus COVID-19 has spread across the country. Senior citizens and individuals with certain underlying health conditions are especially vulnerable to the virus. The World Health Organization declared it to be a pandemic, and both national and state governments, including Illinois, have declared emergencies.

## II.  Legal Standard

The Seventh Circuit uses a two-step analysis to assess whether preliminary injunctive relief is warranted. See *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008). This analysis is the same one that is used to determine if a TRO is warranted. *Gray v. Orr*, 4 F. Supp. 3d 984, 989 n.2 (N.D. Ill. 2013). "In the first phase, the party

seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015). If the movant makes the required threshold showing, then the court moves on to the second stage and considers: "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties," *i.e.* the public interest. *Id.* at 662. The Court balances the potential harms on a sliding scale against the movant's likelihood of success. The greater the movant's likelihood of success, "the less strong a showing" the movant "must make that the balance of harm is in its favor." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).

### III. Analysis

#### A. Irreparable Harm to Plaintiff

Plaintiff asserts that if Defendant stops providing food and cleaning services to the 1,600 senior citizens in Plaintiff's facilities on seven days' notice, it would be impossible for Plaintiff and its new vendor to find, hire, and train staff in time to take over the services. [12, at 14]. As a result, Plaintiff's residents would be left without access to food, sanitizing, and cleaning services, and Plaintiff would face serious reputational consequences, not to mention the harm to Plaintiffs' residents' health and physical well-being. Money damages would not be enough to make up for these harms, which seem to the Court to be irreparable. This factor weights in favor of Plaintiff.

Defendant argues that the harm is self-inflicted because Plaintiff breached the contract and failed to arrange for a speedy transition of services. [16 at 11.] The question of breach is up in the

air at this stage, but Defendant's transition argument is unpersuasive. Plaintiff has also represented to the Court that it is attempting to transition quickly and plans to begin moving Morrison out of Plaintiff's facilities by May 10, 2020 and complete the process in early June. Especially in the middle of a pandemic, that does not seem overly slow. In any event, even if Defendant were correct, neither point would mean that the harm to Plaintiff was not irreparable.

B.     **No Adequate Remedy at Law**

Plaintiff argues there is no adequate remedy at law for the reputational harm Plaintiff would face or the physical and health risks its residents would face. The Court agrees; neither money damages nor other ex post relief the Court can conceive of would be an adequate remedy if Defendant ceased providing essential food and cleaning services to Plaintiff and its residents.

C.     **Reasonable Likelihood of Success on the Merits**

"At the preliminary injunction stage, the plaintiff must show that 'it has a better than negligible chance of succeeding on the merits so that injunctive relief would be justified.'" *Personeta, Inc. v. Persona Software, Inc.*, 418 F. Supp. 2d 1013, 1016 (N.D. Ill. 2005) (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001)). Plaintiff's complaint asserts claims for: declaratory judgment that Defendant's purported termination of the contract is invalid (Count I); and breach of contract and covenant of good faith and fair dealing (Count II). These issues are messy, but Plaintiff's chance of success is better than negligible.

First, Plaintiff argues that Defendant's purported termination of the contract is invalid because Plaintiff reasonably disputed the invoices it did not pay and Defendant never provided support (to Plaintiff or to the Court in any recent filings) for the charges on those invoices. Defendant counters that the contract requires written notice of disputed charges, which Plaintiff never provided. Plaintiff responds that executives at both companies have discussed the disputes

6

for months, which informed Defendant of the dispute and satisfies the purpose of providing notice. [18, at 3-4.] More broadly, each accuses the other of breaching the contract and not acting in good faith at some point in their dealings.

With each side pointing fingers at the other, it is not obvious who will ultimately prevail. Maybe Plaintiff terminated the contract, maybe Defendant did. (Actually, it is not clear to the Court at this stage that *either* party has validly terminated the contract, but that is a question for another day.) Maybe Plaintiff breached the contract, or maybe Defendant did. In such circumstances, Plaintiff has some chance of prevailing on the merits, and certainly a better than negligible chance. This factor weighs in Plaintiff's favor.

### D. Balance of Harms

Defendant argues that a TRO or preliminary injunction would trap it in a relationship with a counterparty that is not paying its bills. Even if true—and Plaintiff has represented to the Court that it will pay Defendant for all services provided during the transition period—Defendant would merely accrue additional sums that it claims Plaintiff owes, which could easily be sorted out in the remainder of the case. None of the harms Defendant articulated are irreparable. On the other hand, without a TRO, if Defendant followed through on its threats to cease providing services, Plaintiff would be faced with finding immediate care for 1,600 senior citizen residents who lacked food, laundry, and essential cleaning services. Those harms significantly outweigh the risks to Defendant. This factor weighs in Plaintiff's favor.

### E. Public Interest

1,600 senior citizen residents live in 11 facilities owned by Plaintiff and serviced by Defendant. They rely on Defendant for meals, for clean clothes and bedding, and for sanitized living spaces. In normal times, these are essential services. During a pandemic, their interest in

7

receiving these services is absolutely critical. And the broader public has a similarly strong interest in protecting this vulnerable population. It is difficult to overstate the strength of the public interest in making sure senior citizens get the services Defendant contracted to supply to them. This factor weighs very heavily in Plaintiff's favor.

> F. **Appropriateness of Injunctive Relief**

Defendant argues that Plaintiff seeks an injunction to force performance of a personal services contract, which would be contrary to public policy. The Court is unpersuaded. First, it is not clear that the agreement at issue is personal services contract. See *Aschermann v. Aetna Life Ins. Co.*, 689 F.3d 726, 729 (7th Cir. 2012) (group insurance policy was not a personal services contract and policyholder had no interest in any particular employee at the insurance company making coverage decisions); *Massachusetts Mut. Life Ins. Co. v. Associated Dry Goods Corp.*, 786 F. Supp. 1403, 1423 (N.D. Ind. 1992) (in the context of injunctive relief, comparing a contract with a corporation to a personal services contract is a "dubious analogy" because "when the party to be compelled is a corporation[,] notions of indentured servitude become inapplicable"). Second, even if it were, some authority suggests that courts can order temporary performance of management and services contracts in order to effectuate orderly transitions. See, *e.g.*, *Gov't Guarantee Fund of Republic of Finland v. Hyatt*, 95 F.3d 291, 307-08 (3d Cir. 1996) (affirming district court order that hotel owner and management company "work together to effect a smooth transition in the management and operation of the Hotel" because termination of the management company "raised fairly complex practical problems, and we will not fault the district court for effectuating the transition in a common sense way"). Third, the Court believes it is also against public policy to allow senior citizens to go without food and cleaning services in the midst of a

global pandemic. If the Court must choose between those public policy principles, it chooses to protect the seniors.

### G. Bond

The Court believes a $10,000 bond is appropriate given that Plaintiff has pledged, and the Court has now ordered, Plaintiff to pay for Defendant's services. But the Court also has the power to modify bond requirements, and if Defendant has concerns about Plaintiff's willingness or ability to pay—though none appear on the record so far—or if Defendant believes it will incur costs of complying with this order not covered by Plaintiff's payments, Defendant may move to modify the bond. The Court is not, however, inclined to grant Defendant's request for an $8 million bond. That amount is damages, *i.e.* what Defendant argues Plaintiff owes on the merits, which may be the proper subject of a counterclaim, but not bond for a TRO. *Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002) (the "purpose of the injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him"); see also *U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.,* 775 F.3d 128, 141 (2d Cir. 2014) ("The Rule 65(c) security, however, is not security for the payment of damages on an ultimate judgment on the merits.") (internal quotation marks omitted) (citing *Global Naps, Inc. v. Verizon New England, Inc.,* 489 F.3d 13, 21 (1st Cir. 2007); *Lever Bros. Co. v. Int'l Chem. Workers Union, Local 217,* 554 F.2d 115, 120 (4th Cir. 1976)).

## IV. Conclusion

For the reasons set forth above, Plaintiff's motion [12] for a TRO is granted. This case is set for a telephonic status hearing on April 22, 2020 at 1:30 p.m. Joint status report as described above is due on April 20, 2020.

Dated: April 10, 2020   _____
　　　　　　　　　　　　　　　　　　Robert M. Dow, Jr.
　　　　　　　　　　　　　　　　　　United States District Judge